## THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Donald and Carlee Simmons, Respondents,

v.

Benson Hyundai, LLC, Appellant.

Appellate Case No. 2019-000344

---

Appeal From Spartanburg County
J. Derham Cole, Circuit Court Judge

---

Opinion No. 5900
Heard December 9, 2021 – Filed March 16, 2022

---

### AFFIRMED AS MODIFIED

---

Bradford Neal Martin and Laura Wilcox Howle Teer,
both of Bradford Neal Martin & Associates, PA, of
Greenville, for Appellant.

E. Warren Moise, of Grimball & Cabaniss, LLC, of
Charleston, for Respondents.

---

**HILL, J.:** This appeal of an order denying Benson Hyundai, LLC's motion to compel arbitration turns on whether Benson and Respondents Donald and Carlee Simmons agreed to arbitrate their dispute over the sale of a car. Respondents sought to buy a car from Benson and finance part of the cost. Benson had Respondents execute a series of documents: a retail buyer's order worksheet, two retail buyer's orders, a special delivery agreement, a retail installment sales contract (RISC), and Benson's Arbitration Policies and Procedures (BAPP). The RISC and the BAPP contained differing arbitration provisions. Respondents gave Benson a down

payment and other monies, traded their old car in, and left in the new one. When Benson realized the final sales price was some $7,000 less than that listed on the worksheet, it called Respondents and attempted to reform the sale based on the mistake. When Respondents refused, Benson claims it agreed to honor the lower price. After Benson was not able to assign the RISC to a suitable lender, it took the position that the documents made clear Respondents would have to return the car if the financing fell through. Respondents refused to return the car, and their monthly payments based on the RISC were returned. There is no evidence Benson returned the trade-in or the up-front monies Respondents tendered. When Respondents sued Benson in circuit court over the sale, Benson moved to compel arbitration. The trial court denied Benson's motion, concluding the arbitration provisions of the RISC and the BAPP were so conflicting no meeting of the minds occurred, and therefore, Benson and Respondents never formed an agreement to arbitrate, and even if they did, the agreement was unconscionable. The trial court also found any contract was illusory as Benson retained the discretion to approve the financing. Benson now appeals. We affirm, finding the parties never formed an agreement to arbitrate but for different reasons than the trial court.

## I. Standard of Review

We review a trial court's ruling on a motion to compel arbitration de novo, but we will not reverse factual findings of the trial court that are reasonably supported by the record. *Partain v. Upstate Auto. Grp.*, 386 S.C. 488, 491, 689 S.E.2d 602, 603 (2010). The Federal Arbitration Act (FAA), 9 U.S.C. § 1 et. seq. (2018), commands that arbitration agreements be treated the same as all other contracts—no more, no less. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) ("[T]he purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so."). Our supreme court has recently returned the legal cliché that the law "favors" arbitration to its proper context, reminding that "statements that the law 'favors' arbitration mean simply that courts must respect and enforce a contractual provision to arbitrate as it respects and enforces all contractual provisions. There is, however, no public policy—federal or state—'favoring' arbitration." *Palmetto Constr. Grp., LLC v. Restoration Specialists, LLC*, 432 S.C. 633, 639, 856 S.E.2d 150, 153 (2021).

## II.

### A. The FAA and Arbitration Agreement Formation

The FAA provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy

thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The parties agree if they have an arbitration agreement, the FAA applies to it. What they disagree about is whether they agreed to arbitrate. Because arbitration under the FAA rests entirely upon consent, it is always up to the court to determine if the parties have an agreement to arbitrate. *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so."). Arbitration may not be compelled unless the court is satisfied "the making of the agreement for arbitration . . . is not in issue." 9 U.S.C § 4. The "making" or formation of—in the sense of the very existence of—the agreement to arbitrate is always a question for the court, not the arbitrator. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (noting it is "well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide"); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."); *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 257–58 (4th Cir. 2021). An arbitration agreement cannot prove itself, so a court necessarily must determine if an agreement has been made according to law, for only then does the jurisdiction of the FAA emerge and allow a court to stay the court action pursuant to § 3 and compel arbitration pursuant to § 4. *See* Rau, *Everything You Really Need to Know About "Separability" in Seventeen Simple Propositions*, 14 Am. Rev. Int'l Arb. 1, 5 (2003) (observing that "one must enter into the [FAA] system *somewhere*" and the idea that an arbitration clause can confirm itself—"'the product, apparently, of some curious process of autogenesis'—is completely alien to our jurisprudence") (footnote omitted); *see also* Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 647 & n.101 (2020).

In the FAA world, the issue of the formation of the arbitration agreement is quite different from the issue of the validity of a concluded agreement, i.e. whether an arbitration agreement that was formed is nevertheless invalid because of fraud, duress, unconscionability, or some other defense to the enforcement of a contract. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 n.2 (2010) ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded . . . .'" (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006))). The United States Supreme Court has held "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid

provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Granite Rock Co.*, 561 U.S. at 299.

Our first step, then, is to decide whether Benson and Respondents formed an agreement to arbitrate. If we conclude they did not, the first step would also be the last because the FAA cannot make parties arbitrate when they have not agreed to do so. But if we conclude they did form an agreement to arbitrate, we would take the second step: deciding whether the concluded arbitration agreement survives Respondents' validity challenge (their claim the arbitration agreement is unconscionable), assuming the parties have not delegated that issue to the arbitrator. It is only at this second step that we apply the "separability" doctrine of *Prima Paint*. 388 U.S. at 403–04 (holding a court deciding motion to compel arbitration may only consider validity challenges that are specific to the concluded arbitration agreement, and in doing so, must separate the arbitration agreement from remainder of contract; if court is satisfied arbitration agreement is valid, § 4 requires that any challenges to the validity of the underlying, broader contract in which the arbitration clause is contained must be heard by arbitrator).

The two-step sequence can be summarized as follows: (1) resolution of any challenge to the formation of the arbitration agreement, consistent with *Granite Rock*, and (2) determining whether any subsequent challenges are to the entire agreement or to the arbitration clause specifically, consistent with *Prima Paint. See Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 (11th Cir. 2012) (describing two-step process and explaining that "*Granite Rock*'s threshold inquiry of whether a contract was formed necessarily precedes" the "determination of whether any subsequent challenges are to the entire agreement, or to the arbitration clause specifically" under the severability principle); *see also In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 879–80 (6th Cir. 2021) (adopting similar two-step process and noting that "even where a delegation provision purports to require arbitration of formation issues, the severability principle does not apply and courts must decide challenges to the formation or 'existence of an agreement in the first instance ("whether it was in fact agreed to" or "was ever concluded")'" (quoting *VIP, Inc. v. KYB Corp. (In re Auto. Parts Antitrust Litig.)*, 951 F.3d 377, 386 (6th Cir. 2020))); *accord MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 400–02 (3d Cir. 2020) (collecting cases).

Having settled the ground rules, we now proceed to the first step: deciding if the parties have an agreement to arbitrate, which we decide applying South Carolina contract law. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under South Carolina law, a contract cannot be formed without a meeting of the

minds between the parties as to all essential and material terms. *Player v. Chandler*, 299 S.C. 101, 105, 382 S.E.2d 891, 893 (1989). The parties must also "manifest a mutual intent to be bound." *Stanley Smith & Sons v. Limestone Coll.*, 283 S.C. 430, 433, 322 S.E.2d 474, 477 (Ct. App. 1984).

### B. The Parties' Transaction

Benson presses several sophisticated arguments as to why it has an agreement to arbitrate with Respondents. The condensed version is that Benson believes only the BAPP arbitration provision is binding, and therefore the trial court erred in finding a conflict between the arbitration provisions of the RISC and the BAPP. According to Benson, the arbitration provision contained in the RISC was never effective because Benson never signed the RISC and the RISC was conditioned on its being assigned to a third party financier. Alternatively, Benson argues the BAPP was the last document signed, and due to the doctrines of contract modification and merger, the arbitration provision of the RISC was discharged and the BAPP became the only surviving arbitration agreement.

We do not need to test all these angles, for this appeal may be decided on a straighter plane of basic contract formation. *See* Rule 220(c), SCACR (appellate court may affirm for any reason appearing in the record). The special delivery agreement states Benson will attempt to assign the RISC on terms satisfactory to Benson, and if the assignment is successful, "the [RISC] (and all other documents executed by Buyer) shall be deemed delivered and fully binding." Because the assignment never occurred, the parties never became bound by any of the other documents, including the arbitration provisions of the RISC and the BAPP. *See Hughes v. Edwards*, 265 S.C. 529, 536, 220 S.E.2d 231, 234 (1975) ("There can be no contract so long as, in the contemplation of the parties thereto, something remains to be done to establish contract relations."); 1 *Williston on Contracts* § 3:5 (4th ed. 2021) ("[I]f the parties to an agreement specifically provide that no legal obligation is thereby created, that provision will be respected by the law, to the same degree that any other term of their agreement would be . . . ."). The Montana supreme court reached the same conclusion in the context of a motion to compel arbitration involving very similar documents. *Thompson v. Lithia Chrysler Jeep Dodge of Great Falls, Inc.*, 185 P.3d 332, 340 (Mont. 2008) (holding buyer's order and RISC in transaction for sale of car that stated no binding contract was created until obtaining satisfactory financing was condition precedent to formation of contract, including arbitration provisions). We must enforce the special delivery agreement as written, "regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." *Ellis v. Taylor*, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994).

We have held car transactions like the one structured by the documents here—whereby the consumer accepts conditional delivery of the car but the entire deal is expressly conditioned on the dealer's satisfactory assignment of the financing—do not amount to enforceable contracts if the assignment fails. *Brewer v. Stokes Kia, Isuzu, Subaru, Inc.*, 364 S.C. 444, 451, 613 S.E.2d 802, 806 (Ct. App. 2005). The special delivery agreement declared the parties' intent to not be bound if the assignment of the financing failed. When it failed, so did the formation of the parties' arbitration agreement. *Brewer* permits a dealer to draft transaction documents in such a way as to hedge its bets. 364 S.C. at 451-52, S.E.2d at 807. As long as the conditional nature of the contract is explained openly and transparently (and the covenant of good faith and fair dealing complied with), these deals are not considered the type of "yo-yo sales" forbidden by *Singleton v. Stokes Motors, Inc.*, 358 S.C. 369, 381–82, 595 S.E.2d 461, 467–68 (2004). This transparency also allows a court to see, as we do here, that while it may seem everyone to the transaction was nodding about arbitration, in the end no one agreed to it. Because no agreement to arbitrate was formed, we have no need to proceed to the second step of the analysis.

Nor do we need to consider, as an additional sustaining ground, the trial court's finding that the entire contractual arrangement was illusory. We do point out, though, that the illusion question is properly framed as asking whether a contract fails because at least one side's promise to perform was illusory, negating the mutual intent to be bound. The classic example involves a situation where both parties' promises are illusory and was given over four centuries ago by John Selden (who John Milton thought the most learned man of his age):

> Lady Kent articled with Sir Edward Herbert that he should come to her when she sent for him, and stay with her as long as she would have liked him, to which he set his hand; then he articled with her that he should go away when he pleased and stay away as long as he pleased, to which she set her hand.

1 *Corbin on Contracts* § 1.17 (rev. ed. 2018) (quoting John Selden, *Table Talk*).

The ruling of the distinguished trial court denying Benson's motion to compel arbitration is therefore

**AFFIRMED AS MODIFIED.**

**KONDUROS and HEWITT, JJ., concur**.